## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**STAR HARBOR CAPITAL, LLC,**

  **Plaintiff,**

**v.**

**WENLAMBO TWO LIMITED,**
**HMSRSV, LLC, and ROBERT SHAVELL,**

  **Defendants.**

**Case No.: 1:25-cv-10070-MJJ**

## FIRST AMENDED VERIFIED COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff Star Harbor Capital, LLC ("Star Harbor"), for its First Amended Verified Complaint against Defendants Wenlambo Two Limited ("Wenlambo"), HMSRSV, LLC, and Robert Shavell ("Shavell") (collectively, "Defendants"), alleges as follows:

### SUMMARY

1. This matter involves material misrepresentations as to the sale and possession of securities, and otherwise, made by the Defendants which induced the Plaintiff to purchase an interest in the partnership Wenlambo, with the reasonable expectation to receive full and complete profit distributions of its crypto currency investments in accordance with the Plaintiff's percentage of ownership interest in Wenlambo.

2. Rather than receiving complete distributions, the Defendants improperly and deceptively held back monies properly due to Plaintiff without legal justification.

**VIOLATIONS**

3.      By virtue of the foregoing conduct and as alleged further herein, Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

4.      The Defendants also committed breach of contract and breach of fiduciary duty owed to Plaintiff.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction over the federal cause of action pursuant to Section 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77(d) and 77v(a), and Sections 21(d)(3) and 27 of the Exchange Act [15 U.S.C. § 78aa].  This Court has jurisdiction over the state common law causes of action pursuant to 28 U.S.C. § 1367.

6.      Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

7.      Venue is proper because at all times relevant to the allegations herein, Wenlambo conducted business and maintained an office in Boston, Massachusetts, and Plaintiff's sole shareholder resides in Somerville, Massachusetts. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District.

**PARTIES**

8.      Plaintiff Star Harbor Capital, LLC ("Star Harbor") is a Limited Liability Company duly formed and operating in good standing, incorporated in the state of Missouri, whose Registered Agent is located in Clayton, MO and whose principal place of business is in Somerville,

Massachusetts.  Star Harbor is a single-member LLC, the single member of which is AWS IRA. AWS IRA is controlled by Andrew Sudbury ("Sudbury"), who is also the sole beneficiary of AWS IRA.  Sudbury resides in Somerville, County of Middlesex, within the Commonwealth of Massachusetts.

9.      Defendant Wenlambo Two Limited ("Wenlambo") is a partnership which identifies its mailing address as being on Washington Street in Boston, County of Suffolk, Commonwealth of Massachusetts.  Wenlambo was formed in or about July 2018 and identifies itself as a foreign partnership.  Plaintiff is informed and believes and thereupon alleges that at all pertinent times herein, Wenlambo transacted business within the Commonwealth of Massachusetts by, among other manners, soliciting investments in Wenlambo, including but not limited from Star Harbor.  This Court has personal jurisdiction over Wenlambo pursuant to MASS. GEN. LAWS c. 223A, § 3.

10.     HMSRSV, LLC is a limited liability company incorporated in the State of Delaware and which identified its address at all times pertinent to the allegations made herein as being 50 Franklin Street in Boston, Commonwealth of Massachusetts, County of Suffolk. HMSRSV is a Director of Wenlambo, appointed as such on July 13, 2018.

11.     Defendant Robert Shavell ("Shavell") is an individual who resided in Boston, County of Suffolk, Commonwealth of Massachusetts, at all times pertinent to the allegations made herein.  Shavell is the co-founder, a shareholder, and a Member of Wenlambo.  Upon information and belief, Shavell presently resides in the State of Connecticut.

## FACTUAL ALLEGATIONS

12.     Wenlambo is partnership formed in or about July 2018 for the principal purpose of purchasing, investing in, and staking cryptocurrency.  Specifically, Wenlambo sought to and ultimately did purchase the cryptocurrency Luna Tokens.

13.     Through an agreement with a Singaporean entity, Terraform Labs, Wenlambo purchased a block of 133,333 Luna Tokens in 2019.  This purchase of Luna Tokens by Wenlambo was a side transaction to a larger cryptocurrency transaction involving Terraform Labs and presented a path for Shavell and other individual investors to purchase Luna Tokens directly and realize the potentially extraordinary return on investment this particular form of cryptocurrency afforded.

14.     Sudbury was familiar with both Shavell through previous business dealings. Sudbury also has a particular technical knowledge and expertise regarding cryptocurrency purchasing, investing, staking, security, management, and sales.

15.     Sudbury, in his personal capacity, voluntarily provided certain technical assistance to Shavell and others with respect to the Luna Tokens purchased from Terraform Labs.

16.     In the course of providing such technical assistance, Shavell kept Sudbury informed of certain investment solicitations and recommendations Shavell and others made specific to raising additional funds for the designated purpose of purchasing additional Luna Tokens from Terraform.

17.     Sudbury thereafter inquired of Shavell and others at Wenlambo into the details of the Wenlambo-Terraform Luna Tokens purchase and resulting chain and whether it would be possible to join Wenlambo by purchasing additional Luna Tokens.

18.     Through a series of discussions and email exchanges, both Shavell and the other co-founder of Wenlambo, acting at all times with the apparent authority to bind and control Wenlambo, and on information and belief acting with express authority to bind and control Wenlambo: provided details of Wenlambo's Luna Tokens investment with Terraform including investment amounts, timing, and lock-up periods; marketed the potential investment return an investment in Luna Tokens could achieve; and solicited funds from Sudbury to invest in and thereafter become a member of the Wenlambo partnership.

19.     Indeed, in or about May 2020, Shavell, acting at all times with the apparent authority to bind and control Wenlambo, and on information and belief acting with express authority to bind and control Wenlambo, pressured Sudbury into participating in a subsequent purchase of Luna Tokens by Wenlambo, writing in a series of emails to Sudbury:

- May 18, 2020: "we may have like $20K avail – i am not sure. checking with David but will need to act fast. remember lockup is 18months."

- May 28, 2020: "fyi: let me know if you want in on this. wires will need to happen tomorrow i think as we wire Terra next week. it would go to wenlambo two BVI and we'd sign a payment direction letter. keep in mind, 18 month lock."

20.     Based on the representations Shavell and others within Wenlambo made regarding the investment opportunity offered by Wenlambo with respect to this additional purchase of Luna Tokens from Terraform, based on the pressure Shavell applied to Sudbury regarding timing and the need to act immediately, and in reasonable reliance upon the apparent authority with which Shavell was acting on behalf of Wenlambo, Sudbury caused an investment to be made by Star Harbor into Wenlambo.

21.     The aforesaid communications and representations made by Shavell and others within Wenlambo and on behalf of Wenlambo constituted an offer of contract to Star Harbor that could be accepted by payment of Twenty Thousand Dollars ($20,000.00).

22.     Star Harbor's investment of Twenty Thousand Dollars ($20,000.00) was an acceptance by performance of Wenlambo's offer of contract upon the material terms set forth by the aforesaid communications and representations made by Shavell and others within Wenlambo on behalf of Wenlambo.

23.     Included in the representations Shavell and others within Wenlambo made on behalf of Wenlambo, all of whom were acting at all times with the apparent authority to bind and control Wenlambo, and on information and belief acting with express authority to bind and control Wenlambo, was the assurance that Sudbury, or his designee, would receive all proceeds, entitlements, and rewards associated with or resulting from any investment Sudbury or his designee made in Wenlambo.

24.     At no time did either Shavell or anyone else within Wenlambo represent or disclose that there was a possibility of Wenlambo holding back or retaining any portion of any proceeds or investment returns resulting from any investment Sudbury or his designee made in Wenlambo.

25.     The lack of any insinuation from Wenlambo, its Director HMSRSV, and Shavell that there would be any holdback or retention of investment returns or proceeds was consistent with prior cryptocurrency-token transactions that Sudbury had undertaken, as well as being consistent with cryptocurrency investing norms and practices.

26.     On or about May 29, 2020, in reasonable reliance upon the representations Shavell and others from Wenlambo made, while all were acting at all times with the apparent authority to bind and control Wenlambo, and on information and belief acting with express authority to bind and control Wenlambo, regarding Wenlambo's operations and his entitlement to receive all proceeds, entitlements, and rewards associated with or resulting from any investment Sudbury or

his designed made in Wenlambo, Sudbury caused Star Harbor to make a Twenty Thousand Dollar ($20,000.00) investment into Wenlambo, which Wenlambo accepted.

27.    In accepting Star Harbor's $20,000 investment, Wenlambo thereafter admitted Star Harbor as a Member or Partner within the Wenlambo partnership.

28.    Star Harbor thereafter was listed on the tax filings and associated documents of Wenlambo as a Partner, identified as having a capital in the Wenlambo partnership, identified as being entitled to profits and being responsible for potential losses, and identified as having partnership interest in Wenlambo.

29.    Following Star Harbor's investment in Wenlambo, Wenlambo elected to "stake" the Luna Tokens it purchased for its Members on a Terraform validator.  Acting on behalf of Wenlambo, with the apparent authority to bind and control Wenlambo, and on information and belief acting with express authority to bind and control Wenlambo, Shavell wrote to Sudbury on June 4, 2020 and instructed him to take the following actions regarding the staking process: "if you can get that done this weekend be good as we all earn some crazy % / month on this…"

30.    Staking of cryptocurrency is a common occurrence whereby owners of cryptocurrency "stake" or lock their digital tokens on a particular blockchain (here, the blockchain controlled by Terraform Labs, which sold Wenlambo the Luna Tokens).  In exchange for staking their tokens to a particular blockchain, the token owners receive rewards, most commonly in the form of additional digital tokens.

31.    At no time did Wenlambo, HMSRSV, Shavell, or anyone else in ownership or control of Wenlambo ever suggest or insinuate that any portion of the staking rewards created by Wenlambo staking its Luna Tokens on the Terraform blockchain would be retained by Wenlambo or its Founders, Shavell included.

32.    Shavell and the other founder of Wenlambo, each acting at all times with the apparent authority to bind and control Wenlambo, and on information and belief acting with express authority to bind and control Wenlambo, made the material misrepresentation to its investors, including Star Harbor, that each Member or Partner would receive the entire value of the Luna Tokens and all associated staking rewards and airdrops corresponding to each Member or Partner's percentage of ownership in Wenlambo.

33.    "Airdrops" are commonplace in the crypto currency market and are an ancillary transaction whereby a crypto currency company sends a token or coin, generally for free, to existing crypto currency wallets in an effort to draw attention to their company and its cryptocurrency offering(s).

34.    Between the time Wenlambo purchased both amounts of Luna Tokens from Terraform Labs for the benefit of its Members or Partners and 2022, the Luna Tokens held by Wenlambo increased dramatically in value.  This increase in value included not only the "principal" value of the Tokens themselves, but also the value of the staking rewards and airdrop sales that the Tokens generated, the entirety of which the Wenlambo Members or Partners were entitled to.

35.    Given the substantial increase in value of the Luna Tokens and the associated staking rewards and airdrop sales, Star Harbor requested a distribution from Wenlambo in January 2022.  Star Harbor directed this request to Shavell, given Shavell's history of acting on behalf of Wenlambo when directing Sudbury to manage aspects of Wenlambo's Luna Tokens investment, including but not limited to the staking of Luna Tokens.

36.    In what should have been a warning to Star Harbor and in breach of the fiduciary obligations owed to Star Harbor, Shavell interfered with Star Harbor's distribution request by

referring Star Harbor to his co-founder of Wenlambo for approval and processing of the request in an effort to block Star Harbor from receiving distributions to which it was entitled. Star Harbor informed Shavell that his Wenlambo co-founder, acting with apparent authority to bind and control Wenlambo, had already confirmed Star Harbor should work through Shavell to complete the distribution request.

37. Wenlambo ultimately processed on January 24, 2022 the first of several distributions to Star Harbor. Beginning with this first distribution on January 24, 2022, Wenlambo ultimately made seven (7) distributions to Star Harbor by May 2022 totaling $14,094,448.79.

38. In connection with the second distribution Wenlambo processed, Shavell—falsely and without any legitimate basis stated, "i know nothing about staking but think all staking should go to mgmt. fees 0 to you and others." The baseless assertion that Wenlambo was perhaps entitled to retain staking rewards as management fees, such assertion being pushed by Shavell, was not only a breach of the Partnership obligations owed to Star Harbor given its status as a Member or Partner of Wenlambo but was also a clear breach of the fiduciary duty owed to Star Harbor.

39. Despite Shavell's attempt to fraudulently deprive Star Harbor (and presumably the other Members or Partners of Wenlambo) from all of the profits and investment proceeds to which it was entitled from Wenlambo, Wenlambo did not deduct from any of the seven (7) distributions it made to Star Harbor any staking rewards or airdrop sales that its Luna Token investment had achieved.

40. Indeed, Shavell, acting at all times with the apparent authority to bind and control Wenlambo, and on information and belief acting with express authority to bind and control

Wenlambo, provided the Wenlambo Members and Partners a chart in April 2022 of the estimated distributions Wenlambo made in 2021 for taxation purposes. Nothing in this table that Wenlambo prepared, and Shavell distributed on behalf of Wenlambo, indicates that the distribution amounts shown constituted Luna Token principal amounts only and did not include additional staking reward or airdrop sales amounts.

41.     Star Harbor reasonably relied on the information Shavell provided on behalf of Wenlambo for the proposition that its distributions from Wenlambo included all amounts owed, including principal Luna Token proceeds as well as staking rewards and airdrop sales, all of which it was entitled to.

42.     The distribution to Star Harbor of the full amount owed it in accordance with its Membership or Partnership percentage of Wenlambo—such distribution comprised of principal Luna Tokens, staking rewards, and airdrop sales—evidences that Wenlambo acknowledged and understood that it was obligated to distribute all such amounts to its Members and Partners and was not entitled to unilaterally decide to retain staking rewards, airdrop sales, or any other amounts or proceeds as management fees or otherwise.

43.     Wenlambo never deducted any amounts as "management fees" from the distributions made to Star Harbor between January 2022 and May 2022. Star Harbor nonetheless had numerous discussions with Wenlambo's principals regarding the principal Luna Tokens sold as well as the associated staking rewards and airdrop sales given its concern Wenlambo previously attempted to wrongfully withhold such proceeds and may likely attempt to do so again. Star Harbor stated unambiguously and repeatedly during these discussions that Wenlambo had no legitimate basis to claim that any portion of the proceeds distributed to its Members or Partners were "management fees" or any other amount that Wenlambo was entitled to retain

rather than distribute. Wenlambo's principals and controlling shareholders confirmed his agreement with this key point.

44.     Following receipt of its final distribution on May 26, 2022, Star Harbor continued to press Shavell and the other principal of Wenlambo, each acting as agents of Wenlambo, for an accounting of the staking rewards and airdrop sales created by the Luna Tokens Wenlambo purchased. Star Harbor reminded Shavell and Wenlambo that these staking rewards and airdrop sales, to the extent they had already been sold and proceeds received, were to have been included in the distributions that Wenlambo had made. To the extent that such staking rewards and airdrop sales had accrued but not yet been sold, Star Harbor reminded Shavell and Wenlambo that such amounts, when sold, were to be distributed to the Members or Partners of Wenlambo.

45.     Wenlambo, through Shavell and the other principals of Wenlambo, repeatedly evaded Star Harbor's communications regarding distribution of these staking rewards and airdrop sales in a deliberate scheme to fraudulently retain amounts owed to the Wenlambo Members and Partners, Star Harbor included, in breach of the obligations owed Star Harbor given its status as a Member or Partner of Wenlambo, in breach of the fiduciary obligations owed Star Harbor, and in violation of applicable securities laws and regulations.

46.     In and around this time, mid-late 2022, the staking rewards and airdrop sale amounts totaled almost $700,000. Star Harbor again pressed Wenlambo to sell and distribute to its Members and Partners these proceeds.

47.     Despite Star Harbor's repeated attempts to have Wenlambo distribute the significant staking rewards and airdrop sale amounts, Wenlambo, through its authorized agents and representatives in Shavell and others, engaged in a campaign of deception and obfuscation

over the next 18 months, all in an effort to deprive Star Harbor (and the other Members and Partners of Wenlambo) from the amounts and proceeds due them.

48.     Upon information and belief, as Star Harbor continued to press Wenlambo to properly distribute all amounts due to all Members and Partners, Shavell and his Wenlambo co-founder took for themselves—without deducting any management fees or other amounts—staking rewards and airdrop sale amounts.

49.     In response to Star Harbor's repeated demands for accountings, updates, and actual distributions, Wenlambo continued to stonewall Star Harbor with Shavell referring Star Harbor to other representatives and owners of Wenlambo only to then have such individuals then refer Star Harbor back to Shavell.

50.     At no time did either Shavell or his co-founder of Wenlambo state or insinuate to Star Harbor in any way that they did not control, direct, or otherwise manage Wenlambo. To the contrary, each of Shavell and the other founder of Wenlambo acted towards Star Harbor and the other Members or Partners of Wenlambo that each controlled, directed, managed, and made all decisions for Wenlambo. Star Harbor reasonably relied upon the apparent authority that each of Shavell and his Wenlambo co-founder acted with as to Wenlambo.

51.     Only after repeated demands did Shavell finally directly engage with Star Harbor with respect to its demand to receive all distributions to which it was entitled. Shavell's initial position, expressed on behalf of Wenlambo, while acting with the apparent authority to bind and control Wenlambo, was to offer Star Harbor in April 2023 roughly $40,000. Star Harbor immediately rejected the offer from Wenlambo, made by Shavell, given that the staking rewards and airdrop sales amounts to which Star Harbor was entitled exceeded $800,000 at this point.

52.    Changing its story that Star Harbor was not entitled to its portion of the staking rewards and airdrop sales, Shavell, acting on behalf of Wenlambo with the apparent authority to do so, next offered Star Harbor in May 2023 that Wenlambo would "split the difference" of the amount owed Star Harbor.  This offer was once more rejected.

53.    Wenlambo recently has expanded its fraud upon Star Harbor by claiming, through legal counsel no less, that Star Harbor is not a Member of Wenlambo.  This  despite Star Harbor appearing on all tax documents prepared and filed by Wenlambo since tax year 2020 as a Member or Partner of Wenlambo, as is actually the case.

54.    Wenlambo's repeated and deliberate scheme of deception and fraud, all as related to securities, has caused Star Harbor to incur substantial damages in cash amounts almost totaling One Million Dollars in addition to depriving Star Harbor of its right to possess additional Luna Tokens on the original and a new Terraform blockchain, together with additional USTC tokens Star Harbor is owed.

## COUNT I
### (Breach of Contract)

55.    Plaintiff repeats and incorporates by reference the allegations in Paragraph 1 through 54 as if the same were fully made at length herein.

56.    Plaintiff entered into a contract with Defendants for the purchase of the Luna Tokens at issue.

57.    Specifically, Defendants offered that in exchange for a payment of Twenty Thousand Dollars ($20,000.00), Plaintiff was to receive:

      a.    A general partnership interest in Wenlambo, *i.e.*, a pro rata share of Wenlambo's net profits and losses;

      b.   As a general partner of Wenlambo entitled to a pro rata share of Wenlambo's net profits, Plaintiff would not be charged management fees and other surcharges by Wenlambo in connection with its investment;

      c.   An ownership interest in its pro rata share of Luna tokens purchased by Wenlambo, subject to the same purchase price per unit, lock-up period, and time limitations offered to Wenlambo by the seller; and,

      d.   All attendant proceeds and profits associated with its pro rata share of Luna tokens, including, but not limited to, all staking rewards and airdrops.

58.    Plaintiff accepted Defendants' offer of contract by wiring a payment of Twenty Thousand Dollars ($20,000.00) to Defendants.

59.    Defendants' conduct as described herein constitutes a material breach of the aforesaid contractual obligations and duties owed Plaintiffs that has directly and proximately caused Plaintiff to suffer substantial damages, including but not limited to attorneys' fees and costs.

60.    Plaintiff has satisfied and discharged all contractual obligations and duties he owes Defendants.

61.    Plaintiff is entitled to a judgment awarding its damages, including attorneys' fees and costs, that are the direct and proximate result of Defendants' material breach of its contractual obligations owed to Plaintiff.

## COUNT II
### (Breach of Fiduciary Duty)

62.    Plaintiff repeats and incorporates by reference the allegations in Paragraph 1 through 61 as if the same were fully made at length herein.

63.     Plaintiff has satisfied and discharged all contractual obligations and duties he owes Defendants.

64.     At all relevant times Defendants were subject to a fiduciary duty to the Plaintiff as a Member or Partner of Wenlambo.

65.     Defendants breached their fiduciary duty owed to Plaintiff by, among other things, interfering and depriving Plaintiff of distributions owed to it, which include:

    a.  Defendants' unsupported assertion that Wenlambo was entitled to retain staking rewards as management fees;

    b.  interference with Plaintiff's distributions by blocking Plaintiff from receiving distributions to which it was entitled and falsely and without any support claiming entitlement to retain staking rewards as management fees; and;

    c.  repeated evasion of communications with Plaintiff concerning distribution of staking rewards and airdrop sales in a deliberate scheme to fraudulently retain amounts owed to Defendants, including Plaintiff as a Member or Partner of Wenlambo.

66.     By reason of Defendants' conduct as described above, Defendants breached their fiduciary duty owed to Plaintiff and caused Plaintiff financial harm.

67.     As a result of Defendants' breach of the fiduciary duty it owed Plaintiff at all times relevant to the allegations made herein, Plaintiff has suffered substantial damages in an amount to be proven, such amount including attorneys' fees and costs.

68.     Plaintiff is entitled to a judgment awarding its damages, including attorneys' fees and costs, that are the direct and proximate result of the Defendants' conduct.

### COUNT III
**(Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder)**
**(All Defendants)**

69.     Plaintiff repeats and incorporates by reference the allegations in Paragraph 1 through 68 as if the same were fully made at length herein.

70.     Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

71.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT IV
### (Fraud)
### (All Defendants)

72.     Plaintiff repeats and incorporates by reference the allegations in Paragraph 1 through 71 as if the same were fully made at length herein.

73.     Defendants knowingly, intentionally, falsely, and fraudulently misrepresented the material terms and conditions of Plaintiff's investment by, among other things:

  a.   Falsely and fraudulently misrepresenting that Wenlambo is a general partnership when it is, in fact, a corporation;

b.  Falsely and fraudulently misrepresenting that Plaintiff's investment would confer upon Plaintiff a general partnership interest in Wenlambo, *i.e.*, a pro rata share of Wenlambo's net profits and losses;

c.  Falsely and fraudulently misrepresenting that Plaintiff's investment did, in fact, confer upon Plaintiff a general partnership in Wenlambo by, *inter alia*, preparing and filing IRS Schedule K-1 forms identifying Plaintiff as a general partner of Wenlambo;

d.  Falsely and fraudulently misrepresenting that Plaintiff, as a general partner of Wenlambo entitled to a pro rata share of Wenlambo's net profits, would not be charged management fees and other surcharges by Wenlambo in connection with its investment;

e.  Falsely and fraudulently misrepresenting that Plaintiff's investment conferred an ownership interest in its pro rata share of Luna tokens purchased by Wenlambo; and,

f.  Falsely and fraudulently misrepresenting that Plaintiff's investment in and ownership of Luna tokens entitled Plaintiff to all attendant proceeds and profits associated therewith, including, but not limited to, all staking rewards and airdrops;

74.  Defendants knowingly, intentionally, falsely, and fraudulently misrepresented the material terms and conditions of Plaintiff's investment to induce Plaintiff's investment;

75.  Plaintiff reasonably relied upon Defendants' knowing, intentional, false, fraudulent, and material misrepresentations as described above when it decided to make its investment;

76.     As a result of its reasonable reliance upon Defendants' knowing, intentional, false, fraudulent, and material misrepresentations as described above, Plaintiff has suffered substantial damages in an amount to be proven, such amount including attorneys' fees and costs.

77.     Plaintiff is entitled to a judgment awarding its damages, including attorneys' fees and costs, that are the direct and proximate result of the Defendants' knowing, intentional, false, fraudulent and material misrepresentations.

**COUNT V**
**(Conversion)**
**(All Defendants)**

78.     Plaintiff repeats and incorporates by reference the allegations in Paragraph 1 through 77 as if the same were fully made at length herein.

79.     Plaintiff was entitled to possession, ownership, control, and/or dominion over its pro rata share of its investment property, including, but not limited to, Luna tokens and all proceeds and profits associated therewith, including, but not limited to, staking rewards and airdrops.

80.     Defendants had no right to possess Plaintiff's investment property.

81.     Defendants intentionally and wrongfully exercised ownership, control, or dominion over Plaintiff's investment property by, among other things, withholding the said property as "management fees."

82.     As a result of Defendant's intentional and wrongful acts of possession, ownership, control, or dominion over Plaintiff's investment property, Plaintiff has suffered substantial damages in an amount to be proven, such amount including the fair market value of the investment property at the time Defendants intentionally and wrongfully excluded Plaintiff from its rightful possession, ownership, control, and/or dominion thereof, loss of use and other consequential damages, and attorney's fees and costs.

<u>**COUNT VI**</u>
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**(All Defendants)**

83.    Plaintiff repeats and incorporates by reference the allegations in Paragraph 1 through 82 as if the same were fully made at length herein.

84.    The contract between Plaintiff and Defendants contained an implied covenant of good faith and fair dealing that prohibited Defendants from conducting themselves in any way that would have the effect of injuring or destroying Plaintiff's right to receive the full fruits of the contract.

85.    Defendants breached the implied covenant of good faith and fair dealing by, among other things:

    a.    Knowingly, intentionally, wrongly, falsely, fraudulently, and in bad faith misrepresenting the material terms of the investment contract to induce Plaintiff to enter the contact;

    b.    Knowingly, intentionally, wrongly, falsely, fraudulently, and in bad faith breaching the terms of the investment contract and deviating from established course of performance by charging Plaintiff "management fees";

    c.    Knowingly, intentionally, wrongly, falsely, fraudulently, and in bad faith breaching the terms of the investment contract and deviating from established course of performance by denying Plaintiff its pro rata share of Wenlambo's net profits as a general partner of Wenlambo;

    d.    Knowingly, intentionally, wrongly, falsely, fraudulently, and in bad faith breaching the unlawfully retaining possession over Plaintiff's principal investment property and associated proceeds and profits; and,

     e.   Knowingly, intentionally, wrongly, falsely, fraudulently, and in bad faith evading communications with Plaintiff to frustrate, delay, and prevent Plaintiff from obtaining the full benefit of his bargain and fruits of the contract.

86.    As a result of Defendant's knowing, intentional, wrongful, false, fraudulent, and bad faith breach of contract described above, Plaintiff has suffered substantial damages in an amount to be proven, such amount including attorneys' fees and costs.

87.    Plaintiff is entitled to a judgment awarding its damages, including attorneys' fees and costs, that are the direct and proximate result of the Defendants' knowing, intentional, false, fraudulent and bad faith conduct.

## COUNT VII
**(Civil Conspiracy)**
**(All Defendants)**

88.    Plaintiff repeats and incorporates by reference the allegations in Paragraph 1 through 87 as if the same were fully made at length herein.

89.    Defendants agreed and conspired, either expressly or implicitly, to breach the fiduciary duties they owed to Plaintiff, to defraud Plaintiff, to convert Plaintiff's property, and to breach their contract with Plaintiff in bad faith.

90.    In furtherance of the aforesaid agreement or conspiracy, Defendants, singly or in concert, breached the fiduciary duties they owed to Plaintiff, defrauded Plaintiff, converted Plaintiff's property, and breached their contract with Plaintiff in bad faith by, among other things:

     a.   Knowingly, intentionally, wrongly, falsely, fraudulently, and in bad faith misrepresenting the material terms of the investment contract to induce Plaintiff to enter the contact;

b. Knowingly, intentionally, wrongly, falsely, fraudulently, and in bad faith breaching the terms of the investment contract and deviating from established course of performance by charging Plaintiff "management fees";

c. Knowingly, intentionally, wrongly, falsely, fraudulently, and in bad faith breaching the terms of the investment contract and deviating from established course of performance by denying Plaintiff its pro rata share of Wenlambo's net profits as a general partner of Wenlambo;

d. Knowingly, intentionally, wrongly, falsely, fraudulently, and in bad faith breaching the unlawfully retaining possession over Plaintiff's principal investment property and associated proceeds and profits; and,

e. Knowingly, intentionally, wrongly, falsely, fraudulently, and in bad faith evading communications with Plaintiff to frustrate, delay, and prevent Plaintiff from obtaining the full benefit of his bargain and fruits of the contract.

91.     As a result of the aforesaid agreement or conspiracy and tortious conduct by Defendants in furtherance thereof, Plaintiff has suffered substantial damages in an amount to be proven, such amount including attorneys' fees and costs.

92.     Plaintiff is entitled to a judgment awarding its damages, including attorneys' fees and costs, that are the direct and proximate result of the Defendants' agreement or conspiracy and tortious conduct in furtherance thereof.

## <u>COUNT VIII</u>
**(Promissory Estoppel)**
**(All Defendants)**

93.     Plaintiff repeats and incorporates by reference the allegations in Paragraph 1 through 92 as if the same were fully made at length herein.

94.    Defendants made various representations to Plaintiff in order to induce Plaintiff to contribute money in support of Defendants' investments in Luna tokens and other cryptocurrency assets, including but not limited to, representations that:

    a.  Plaintiff would be compensated with a partnership interest in Wenlambo;

    b.  Plaintiff would be compensated with a pro rata share in Wenlambo's net profits;

    c.  Plaintiff would be compensated with a right of possession, ownership, control, or dominion over its pro rata share of Luna tokens;

    d.  Plaintiff would be compensated with a right of possession, ownership, control, or dominion over all investment proceeds or profits generated by its pro rata share of Luna tokens, including, but not limited to, staking rewards and airdrops;

    e.  Plaintiff would not be charged any "management fees" or other surcharges.

95.    In reasonable reliance on Defendants' representations, Plaintiff contributed significant money to supporting Defendants' investments in Luna tokens and other cryptocurrency assets.

96.    As a result of the aforesaid, Plaintiff has suffered a detriment in the form of unpaid pro rata share in net profits, unpaid investment proceeds, including, but not limited to, staking rewards and airdrops, and the imposition of "management fees" and other surcharges.

97.    Plaintiff is entitled to a judgment awarding its damages, including attorneys' fees and costs, that are the direct and proximate result of the Defendants' breach of promise.

## COUNT IX
### (Chapter 93A, § 11)
### (All Defendants)

98.  Plaintiff repeats and incorporates by reference the allegations in Paragraph 1 through 97 as if the same were fully made at length herein.

99.  At all times relevant hereto, Plaintiff and Defendants were engaged in the conduct of trade or commerce, specifically investments.

100. Defendants engaged in unfair or deceptive acts or practices in investment trade or commerce by, among other things:

    a.  Deceiving Plaintiff as to the terms and conditions of its investment with Wenlambo;

    b.  Deceiving Plaintiff as to its partnership interest in Wenlambo as a result of its investment and/or unfairly depriving Plaintiff of same;

    c.  Deceiving Plaintiff as to its right of possession, ownership, control, or dominion over the investment principal, *i.e.*, Luna tokens, and/or unfairly depriving Plaintiff of same;

    d.  Deceiving Plaintiff as to its right of possession, ownership, control, or dominion over the investment income, *e.g.*, staking rewards and airdrops, and/or unfairly depriving Plaintiff of same; and,

    e.  Deceiving Plaintiff as to its exemption from "management fees" and other surcharges and/or unfairly imposing the same on Plaintiff.

101. As a result of the aforesaid unfair or deceptive acts or practices by Defendants in investment trade or commerce, Plaintiff has suffered substantial damages in an amount to be proven, such amount including attorneys' fees and costs.

102. Plaintiff is entitled to a judgment awarding its damages, including double or treble damages, attorneys' fees and costs, that are the direct and proximate result of the Defendants' unfair or deceptive acts and practices in trade or commerce.

**COUNT X**
**(Constructive Trust)**
**(All Defendants)**

103. Plaintiff repeats and incorporates by reference the allegations in Paragraph 1 through 102 as if the same were fully made at length herein.

104. As a result of the aforesaid fraud and violations of fiduciary duty, Defendants claim legal title to and have become unjustly enriched by Plaintiff's property, including, but not limited to, Plaintiff's principal investment property, *i.e.*, Luna tokens, and investment income generated thereby, *e.g.*, staking rewards and airdrops.

105. Defendants gave no separate consideration to Plaintiff for Plaintiff's property.

106. Defendants had actual knowledge that their possession of Plaintiff's property was the result of fraud, violations of their fiduciary duties, and other wrongful and tortious conduct.

107. As a result of the aforesaid, Defendants hold Plaintiff's property in constructive trust for Plaintiff's benefit.

108. Plaintiff is entitled to a judgment in equity for the return of its property and such other equitable relief as may be available.

## COUNT XI
**(Resulting Trust)**
**(All Defendants)**

109. Plaintiff repeats and incorporates by reference the allegations in Paragraph 1 through 108 as if the same were fully made at length herein.

110. Plaintiff, by and through his payment of $20,000, caused title and possession of a corresponding number of Luna tokens to be transferred to Defendants.

111. Plaintiff did not intend his payment to result in a gift or advancement to Defendants but, rather, intended his payment to be a purchase or investment for Plaintiff's own benefit.

112. As a result of the aforesaid, Defendants hold Plaintiff's property, both principal investment property, *i.e.*, Luna tokens, and investment income generated thereby, *e.g.*, staking rewards and airdrops, in resulting trust for Plaintiff's benefit.

113. Plaintiff is entitled to a judgment in equity for the return of its property and such other equitable relief as may be available.

## DEMAND FOR JUDGMENT

**WHEREFORE**, based on the foregoing allegations made herein, Plaintiff hereby demands that the Court afford it the following relief:

A. Enter Judgment in favor of Plaintiff and against Defendants as to Count I through Count III made in the Complaint and in so doing, award Plaintiff its damages in an amount to be determined at trial, including but not limited to interest, and attorneys' fees and other costs; and

B. Grant Plaintiff such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.

Respectfully submitted,
STAR HARBOR CAPITAL, LLC,

By its attorneys,

*/s/ Brian M. Haney*

Brian M. Haney (BBO #: 661674)
Viktor A. Theiss (BBO #: 565096)
Brian W. Haynes (BBO #: 683047)
CASNER & EDWARDS, LLP
303 Congress Street
Boston, MA 02210
(617) 426-5900
(haney@casneredwards.com)
(theiss@casneredwards.com)

DATED: April 7, 2025

## VERIFICATION

I, Andrew Sudbury, sole beneficiary of AWS IRA, sole member of Star Harbor Capital, LLC, on behalf of Star Harbor Capital, LLC, hereby depose and state as follows: I have read the foregoing Verified Complaint, and, knowing the contents thereof, have found that the allegations of fact set forth therein are based on my own personal knowledge and are true, except as to those allegations stated to be based on information and belief, which I believe to be true, and that no material facts have been omitted therefrom.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS 7th DAY OF APRIL 2025.

Andrew Sudbury

64024.00000/1003852.1

26